(R.D. 11380)

INDEPENDENT CORDAGE CO., INC. *v.* UNITED STATES

(Decided November 8, 1967)

*Allerton deC. Tompkins* for the plaintiff.

*Edwin L. Weisl, Jr.,* Assistant Attorney General (*James S. O'Kelly* and *Dominick M. Minerva,* trial attorneys), for the defendant.

Rao, Chief Judge: In these appeals for reappraisement, which were consolidated at the time of trial, this court is asked to determine whether or not a ¼-cent per pound discount allowed after the purchase of a certain quantity of merchandise within a certain period of time is an element of the export value thereof, as said value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The merchandise, which consists of sisal twine, does not appear on the Final List of products promulgated by the Secretary of the Treasury, pursuant to said simplification act, T.D. 54165. It was exported from Mexico during November 1963. Appraisement was made on the basis of export value as defined in section 402(b), *supra,* at unit prices indicated in red ink, less ocean freight and insurance charges, net packed on gross weight in R64/3255, and at invoice unit values, plus ¼ cent per pound, less ocean freight and insurance charges, net packed on gross weight in R64/3256. The basis of appraisement is not contested. In both cases, it is the propriety of the appraiser's action in disallowing the ¼-cent per pound discount that is in issue.

The pertinent statutory provisions appear as follows:

[Section 402] (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United State, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

[Section 402] (f) Definitions.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
   (A) to all purchasers at wholesale, or
   (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

The record in this case consists of the affidavit of one Mixel J. Jacobo, executed before the Vice Consul of the United States in the city of Merida, State of Yucatan, Mexico, on January 5, 1966, and various attached documents, all of which were received into evidence as plaintiff's exhibit 1. Mr. Jacobo stated in his affidavit that he is a resident of Merida, and that he is and has been since December 21, 1961, sales manager of Cordemex, S.A. de C.V. of Merida (hereinafter referred to as Cordemex), the exporter of the merchandise at bar. According to the affiant, Cordemex was established in 1961 as a semi-official agency of the Mexican Government to "stabilize and coordinate the Mexican hard fiber industry which at that time was in a precarious and chaotic condition resulting from keen competition between cordage mill operators," and for various reasons not here relevant. It was the only concern in Yucatan authorized to export products of Yucatan sisal in 1963, Yucatan being the principal place of production of sisal fiber and sisal cordage in Mexico. As sales manager, Mr. Jacobo is directly responsible for and is familiar with all sale prices, quantities sold, and related details. He is especially acquainted with sales to the United States which is the greatest market in terms of quantities purchased.

All sales and offers for sale to the United States were made from Merida. During the October–November period of 1963, Cordemex had a firm sales policy with respect to the sale of wrapping twine to all wholesale buyers in the United States. Sales prices and terms of sale were controlled by pricelist 64/1, marked as exhibit A of plaintiff's exhibit 1. This document was effective as to all sales on or after August 20, 1963. The prices therein were "offered to all U.S.A. wholesale buyers of cordage who usually bought in carload lots of 30,000 pounds or more." The witness gave as his definition of the term wholesale buyers, those "purchasers who usually bought in wholesale quantities (30,000 pounds or more) for industrial use or for resale other-

wise than at retail." The prices in the aforementioned pricelist were quoted in American dollars, c.i.f., at United States ports. The variations in those prices are the result of the differences in average shipping and insurance costs to the various ports. All prices were, however, based upon a "firm uniform price at [the] manufacturing plants in Mexico."

The affidavit further states that:

The prices quoted in the attached Exhibit A were subject to a ¼¢ per pound discount to all purchasers in the U.S.A. whose purchases of wrapping twine exceeded 500,000 pounds per year on a calendar year basis. (Those purchasers of wrapping twine who also purchased smaller quantities of rope were allowed to include total purchases). Thus, if the quantity of wrapping twine ordered by a U.S.A. buyer through April, 1963, exceeded 500,000 pounds he would receive this ¼¢ per pound discount on all purchases he made that year, including those made during the said January–April period. All U.S.A. purchasers of such wrapping twine were entitled to this ¼¢ per pound discount off of the prices shown in Exhibit A if during the year 1963 their purchases exceeded 500,000 pounds. The practice of granting this ¼¢ per pound discount off list prices to those U.S.A. purchasers of wrapping twine who purchased more than 500,000 pounds per year has been followed by Cordemex since December, 1961, and it is still in effect. It is the normal and ordinary course of the Mexican export trade in this commodity. It was a discount that was freely offered by Cordemex to the U.S.A. trade without restrictions of any kind except as shown in Exhibit A attached.

Exhibit B of plaintiff's exhibit 1 is a schedule listing the names of all American wholesale purchasers of wrapping twine who purchased more than 500,000 pounds in 1963, and the date when said amount was reached. Pursuant to the request of the plaintiff, this list remains confidential. Also included as part of exhibit B are the total quantities, purchased by all other U.S.A. purchasers who did not reach this figure in 1963.

Cordemex was not in any way related to any of its 1963 American wholesale purchasers of wrapping twine or rope, and placed no restrictions of any kind other than as shown in exhibit A, which are immaterial to the disposition of this case in that they are within the contemplation of section 402 (f) (1), *supra*.

The witness further stated in his affidavit that, based upon his computations, which he described, in the period commencing from August of 1963 to the end of that year, the greatest amount of wrapping twine was sold at ¼-cent per pound discount, and that in "November, 1963 the aggregate volume of wrapping twine sold to U.S.A. wholesale buyers with the ¼¢ per pound discount was greater than at any other prices (list prices without discount)."

Exhibits C and D of plaintiff's exhibit 1 are photostatic copies of the invoices in the instant appeals. Exhibit C pertains to R64/3256 and exhibit D to R64/3255. The witness pointed out that the prices in exhibit D associated with order number 16862 are 1 cent per pound lower than the prices stated in exhibit A. This is because order number 16862 was placed with Cordemex on July 4, 1963, at a time when the list price represented by exhibit A was not in effect.

It is the plaintiff's contention that the ¼-cent per pound total quantity discount herein is not a proper element of the export value of the imported merchandise, and that to treat it as such is not precluded by reason of the existence of contrary principles established pursuant to the valuation law as it existed prior to the Customs Simplification Act of 1956. Plaintiff bases this contention upon the argument that the determination of usual wholesale quantities as defined in section 402(f)(5), *supra,* is not expressly limited to individual orders, but can also be predicated on a *per annum* basis. It is further argued that, in order to determine "an aggregate volume," as referred to in the aforementioned statutory definition of usual wholesale quantities, it is necessary to consider an elapsed time period such as a calendar year. Plaintiff concludes that, inasmuch as a greater "aggregate volume" of twine was sold at a ¼-cent per pound discount from August of 1963 through the remainder of the year, said discount was improperly included in the value of the merchandise at bar since it was exported from Mexico during that period.

The defendant maintains that, at the time of exportation, the articles at bar were not freely sold to all purchasers at the ¼-cent per pound discount in that "all purchasers could not obtain the ¼-cent per pound 'discount' price unless they coincidentally happened to have exceeded the 500,000 pound total purchase figure." This, defendant argues, is predicated on the fact that export value in general and the usual wholesale quantities in particular are matters to be determined at the time of exportation and not on a cumulative basis over an elapsed period of time. The defendant further urges that the term "usual wholesale quantities" "does not envisage that one merely determines the total quantity sold at each of several prices" but that it contemplates that "discounts are offered and given *uniformly by quantity categories,*" of which one of the quantities represents the usual wholesale quantity [emphasis quoted].

It is clear that the position of the plaintiff derives from the changes in the statutory definition effected by the Customs Simplification Act of 1956. Under the valuation law as it read prior to this amendment, merchandise was not deemed freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade at a discounted price where the discount was based on the purchase

of a certain quantity or amount in value of merchandise within a certain period of time. *United States* v. *A. W. Faber, Inc.*, 21 CCPA 290, T.D. 46817; *Ramallah Trading Co.* v. *United States*, 24 Cust. Ct. 558, Reap. Dec. 7799; and *United States* v. *Samuel S. Perry*, 65 Treas. Dec. 1775, Reap. Dec. 3364, affirmed, 66 Treas. Dec. 1226, Reap. Dec. 3424. Also see *Adolph Goldmark & Sons Corp.* v. *United States*, 22 CCPA 358, T.D. 47378. This was because in such situations "all purchasers" did not have the opportunity to purchase at the discount price. A free offering did not exist where a restriction in the marketing practice resulted in the "arbitrary exclusion from the market of certain customers or classes of customers by a refusal to sell to them on an equal footing with others, or at all." *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773. "All purchasers" was understood to mean not a majority or some, but *all* who cared to buy in the usual wholesale quantities and in the ordinary course of trade. *American Shipping Co.* v. *United States*, 29 CCPA 250, C.A.D. 198; *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, T.D. 48808; *United States* v. *A. W. Faber, Inc., supra;* and *Ramallah Trading Co.* v. *United States, supra.*

Although under the new law as amended in 1956, the phrase "all purchasers" has been deleted from the primary definition of statutory export value, it remains a significant part of that definition by reason of being incorporated into the definition of the term "freely sold or, in the absence of sales, offered for sale" in section 402(f)(1)(A). It is sales to "*all* purchasers at wholesale" [emphasis added], which continues to qualify the statutory definition, and such only as are made in the usual wholesale quantities and in the ordinary course of trade are the determinants.

In ascertaining the usual wholesale quantity, consideration must, as the plaintiff contends, be given to an elapsed time period. However, an examination covering such a period of time must focus on that price for which merchandise is sold in equivalent *individual* quantities, which when combined form the greatest aggregate volume, and not, as the plaintiff maintains, on the total volume of goods without regard to the quantities in which individual sales were made. It must be the price for one quantity in an aggregate volume "which is greater than the aggregate volume sold at the price or prices for any other quantity." Instead of a "price-for" concept, as required by the statute, plaintiff is attempting to substitute a "price-when" concept, that is, a price dependent on the happening of a certain event, to wit, purchases accumulating in any quantity to a total in excess of 500,000 pounds. If volume alone were considered to be the controlling factor, "*usual* wholesale quantities" [emphasis added] is a misnomer, and the statute need merely have recited that the price for the greatest quantity sold

within a reasonable period represents the value of the merchandise under consideration.

As the court views the problem here involved, there is an absence of proof of the *individual* wholesale quantities in which the merchandise was sold from which a determination of the usual wholesale quantities can be made. In order to fulfill the intended meaning of usual wholesale quantities, there must be proof that sales were made at certain equivalent *individual* quantities which when combined formed the greatest aggregate volume. While most of the purchasers herein seemingly have purchased over 500,000 pounds during a relevant period as evidenced by an examination of exhibit B of plaintiff's exhibit 1, this quantity was derived from totaling the amounts of various individual sales which more than likely were not in individual quantities in excess of 500,000 pounds, especially in the light of the affiant's statement that wholesale buyers are "purchasers who usually bought in wholesale quantities (30,000 pounds or more) * * *." As an amount in excess of 500,000 pounds has not been shown to be the usual wholesale quantity in which the merchandise under consideration was sold in the ordinary course of trade, it is irrelevant that when total purchases of an American buyer exceeded 500,000 pounds, a discount of ¼ cent per pound was given retroactively for the calendar year in which the said amount was reached, and on all further orders during that year.

Accordingly, it cannot be held that the quantity discount here in issue was freely offered to all purchasers at wholesale within the intendment of paragraph 402(b), *supra.*

By reason of the foregoing considerations, the court makes the following findings of fact.

1. That the merchandise involved in the instant appeals for reappraisement consists of sisal twine exported from Mexico on November 19, 1963, and November 27, 1963.

2. That said merchandise does not appear on the Final List, T.D. 54521.

3. That said merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at unit prices indicated in red ink, less ocean freight and insurance charges, net packed on gross weight in R64/3255, and at invoice unit values, plus ¼ cent per pound, less ocean freight and insurance charges, net packed on gross weight in R64/3256.

4. That, where sales exceeded 500,000 pounds in a calendar year, a retroactive and prospective discount was allowed.

5. That there is no evidence of usual wholesale quantities.

6. That there is no evidence of any individual sales in quantities in excess of 500,000 pounds.

The court, therefore, concludes:

1. That export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement.

2. That a quantity in excess of 500,000 pounds of sisal twine has not been established to be the usual wholesale quantity.

3. That the merchandise was not freely sold to all purchasers at wholesale in the usual wholesale quantities and in the ordinary course of trade with a discount of ¼ cent per pound.

4. That the presumptively correct values found by the appraiser have not been negatived.

Judgment will issue accordingly.