**INDEPENDENT CORDAGE CO., Inc.**
v.
**UNITED STATES.**
Reappraisements R64/3255 and R64/3256.

United States Customs Court.
Third Division, Appellate Term.
Aug. 13, 1969.

Allerton deC. Tompkins, New York City, for appellant.

William D. Ruckelshaus, Asst. Atty. Gen., (Steven R. Sosnov, New York City, trial atty.), for appellee.

Before RICHARDSON, LANDIS, and ROSENSTEIN, Judges.

LANDIS, Judge:

This case comes up on application to review, 28 U.S.C., section 2636, the decision below valuing sisal twine exported from Mexico in November, 1963. Independent Cordage Co., Inc. v. United States, 59 Cust.Ct. 718, R.D. 11380 (1967). Two reappraisement appeals, consolidated for trial, are involved.

Export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is conceded to be the correct basis for valuation of the sisal twine. That adjudged export value basis is not before us for review.

The substantive question raised by the various errors recited in appellant's application is whether export value, as defined in section 402(b), as amended, is the price at which the sisal twine was freely sold to all purchasers at wholesale, or, that price "subject to a ¼¢ per pound discount to all purchasers in the U. S. A. whose purchases of wrapping [sisal] twine exceeded 500,000 pounds per year on a calendar year basis." (Exhibit 1.) The decision below sustained the appraised valuations at the selling price to all purchasers without the discount. Appellant alleges that the trial judge erred in disallowing the discount, and asks that we address ourselves to the question whether, as a matter of law, export value, as defined in section 402(b), "permits dutiable values to be based upon a cumulative quantity discount" in a calendar year. (Appellant's brief, page 4a.)

Section 402(b) defines export value as follows:

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The terms used in the export value definition are additionally defined in section 402(f) which states, in pertinent part, that for the purposes of section 402:

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\*   \*   \*   \*   \*   \*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

We must apply the above stated law to the facts. The only evidence of the exporter's prices to the United States is the affidavit of Mixel J. Jacobo (exhibit 1), sales manager of Cordemex, S. A. de C. V. Merida, Yucatan, Mexico (hereinafter Cordemex), the exporter. Attached to it are various sub-exibits "A", "B", "C", and "D" referred to in the affidavit. According to Mr. Jacobo:

4. In the October-November period in 1963 Cordemex had a firm sales policy in connection with wrapping twine sold to all wholesale buyers in the U. S. A. The sales prices and terms of sales were governed by attached Price List No. 64/1, marked Exhibit A, effective as to all sales on or after August 20, 1963. These prices were offered to all U. S. A. wholesale buyers of cordage who usually bought in carload lots of 30,000 pounds or more. By wholesale buyers I mean both

purchasers who usually bought in wholesale quantities (30,000 pounds or more) for industrial use or for resale otherwise than at retail. * * *

5. The prices quoted in the attached Exhibit A were subject to a ¼¢ per pound discount to all purchasers in the U. S. A. whose purchases of wrapping twine exceeded 500,000 pounds per year on a calendar year basis. (Those purchasers of wrapping twine who also purchased smaller quantities of rope were allowed to include total purchases). Thus, if the quantity of wrapping twine ordered by a U. S. A. buyer through April, 1963, exceeded 500,000 pounds he would receive this ¼¢ per pound discount on all purchases he made that year, including those made during the said January-April period. All U. S. A. purchasers of such wrapping twine were entitled to this ¼¢ per pound discount off of the prices shown in Exhibit A if during the year 1963 their purchases exceeded 500,000 pounds. The practice of granting this ¼¢ per pound discount off list prices to those U. S. A. purchasers of wrapping twine who purchased more than 500,000 pounds per year has been followed by Cordemex since December, 1961, and it is still in effect. It is the normal and ordinary course of the Mexican export trade in this commodity. It was a discount that was freely offered by Cordemex to the U. S. A. trade without restrictions of any kind except as shown in Exhibit A attached.

6. Attached hereto and marked Exhibit B is a confidential schedule listing the names of all U. S. A. wholesale purchasers of wrapping twine whose purchases of wrapping twine in 1963 exceeded 500,000 pounds as well as the dates in 1963 when the invoiced shipments to such purchasers reached this 500,000 pound purchase figure. It is requested that the detailed data contained in this Exhibit B be treated as *confidential*. The dates specified have been obtained personally by me from the official sales and ship-

ping records of Cordemex which are kept under my jurisdiction. The total quantities purchased by all other U. S. A. purchasers who did not reach this 500,000 pound purchase figure in 1963 are also set forth in Exhibit B. Cordemex was not related in any way to any of the U. S. A. wholesale buyers who bought wrapping twine or rope from Cordemex in 1963, and Cordemex placed no restrictions of any kind on the sales of wrapping twine to such U. S. A. customers other than as shown on the attached Exhibit A. [Emphasis quoted.]

7. I have checked the sales records of Cordemex to determine the date in 1963 after which more wrapping twine was sold by Cordemex to U. S. A. wholesale purchasers at list prices less the ¼¢ per pound discount, than at list prices. In making this determination I followed the following procedure. I added up the total quantities of wrapping twine sold each month to U. S. A. buyers at list prices, as well as those at list prices less ¼¢ per pound, separately each month beginning January 1963. During the months of January, February, March, April, May, June and July, I found that more was sold each month at list prices. However, in August and for each months [sic] of 1963 thereafter, more wrapping twine was sold at the list prices less the ¼¢ per pound discount. I find that on and after August, in 1963 more wrapping twine was sold at the list prices less the ¼¢ per pound discount. Thus in November, 1963 and for a reasonable time prior thereto such wrapping twine was sold in larger quantities to U. S. A. wholesale purchasers at list prices less the ¼¢ per pound discount. In November, 1963 the aggregate volume of wrapping twine sold to U. S. A. wholesale buyers with the ¼¢ per pound discount was greater than at any other prices (list prices without discount).

Appellant admits that under the judicial precedents, cited by the trial judge, construing the so-called old law export

value definition, section 402a(d), as amended, T.D. 54165, the ¼ cent discount, based as it is on cumulative quantities purchased by some, rather than on the quantities in which the sisal twine is usually sold to all, would not qualify as an export price to all purchasers. As appellant would have it, the new law, defining the term "usual wholesale quantities" in any case in which the merchandise being valued is sold at different prices for different quantities, requires a different construction. What appellant has done is inject into the facts an issue of "usual wholesale quantities" on the legal premise that the total cumulative quantity of the individual quantities sold and purchased in a calendar year, is just as much a usual wholesale quantity as are the individual quantities. (Appellant's brief, page 5.)

■ The trial judge rejected appellant's legal premise and held that, as a matter of law, it is the individual wholesale quantities in which merchandise is freely sold to all purchasers in the ordinary course of trade that determines "usual wholesale quantities", not the cumulative quantity purchased by some over an elapsed period. We read the law the same way. So read, we also find that, as a matter of fact, the sisal twine was not sold at different prices for different quantities, which is the factual reason for section 402(f) (5), *supra*, and affirm the decision below.

Our basic approach to the law is the same as that so well stated by the trial judge in his opinion decision:

Although, under the new law as amended in 1956, the phrase "all purchasers" has been deleted from the primary definition of statutory export value, it remains a significant part of that definition by reason of being incorporated into the definition of the term "freely sold or, in the absence of sales, offered for sale" in section 402 (f) (1) (A). It is sales to "*all* purchasers at wholesale" * * *, which continues to qualify the statutory definition, and such only as are made in the usual wholesale quantities and in

the ordinary course of trade are the determinants. [Emphasis quoted. Independent Cordage Co., Inc. v. United States, *supra*, at page 723.]

Our court of appeals espoused the same approach in Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, C.A.D. 846 (1964).

■ Appellant's approach to the law is to discuss the definition of "usual wholesale quantities" as if isolated from the basic section 402(b) definition. The danger in that approach, in our opinion, is to talk around part of the law without reaching its meat. Thus, to say, as appellant does, that we must consider cumulative quantities, in conjunction with the definition of "usual wholesale quantities", because there is a price dependent upon an "aggregate volume" in excess of 500,000 pounds purchased during the course of a calendar year takes us nowhere. The only quantities that are relevant under section 402(b) are those quantities in which the merchandise is freely sold. Discussion of "usual wholesale quantities" aside, the fact is that the sisal twine was never sold for export, and no one ever purchased, in quantities of 500,000 pounds at the discounted price. It seems clear to us, therefore, that the 500,000 pound quantity, whether called "usual" or "wholesale" or what, is a quantity with no viable base in the statute which defines export value in terms of the quantity at which merchandise is "freely sold".

■ Emphasizing, as we have, how the sisal twine was sold, we can now take up, as appellant asks, the definition of "usual wholesale quantities" in section 402(f) (5). We note that it equally speaks to how the merchandise is *sold*. As we have construed, BMC Trading Corp. et al. v. United States, 60 Cust.Ct. 961, A.R.D. 238 (1968), and appellant says (appellant's brief, page 7) section 402(f) (5) is not concerned with the aggregate volume sold, except in the factual situation where merchandise "is *sold* in the market under consideration at different prices for different quantities." [Emphasis added.] What

Congress intended in that factual situation was:

> \* \* \* that there be but one usual wholesale quantity and that the same rate of duty should apply to *all* importations of identical merchandise purchased from the same exporter in the same market at the same time. [Emphasis added. F. S. Whelan & Sons v. United States, 39 CCPA 168, 172, C.A.D. 482 (1952), certiorari denied 344 U.S. 818, 73 S.Ct. 13, 97 L.Ed. 636.]

Since appellant assures that "[i]n November 1963 small purchasers ordering one (or more) carload paid list prices, and large purchasers ordering the *same quantity* received the ¼¢ per pound discount" (appellant's brief, pages 9 and 10), it is a fact that the selling prices differed for the same quantity, not different quantities, and we so find. The fact that in November, 1963 more sisal twine was sold at the ¼ cent discount price, than at the price without the discount, merely illustrates the difference in prices to purchasers buying in the same wholesale quantity. A bit more difficult to grasp perhaps, but illustrating how prices were adjusted as to become different for purchasers who bought in the same wholesale quantity, is the fact that the discount price was made retroactive to all wholesale quantities of sisal twine previously purchased in the calendar year, but only to those whose total purchases in the calendar year exceeded 500,000 pounds.

Lacking, as we find, the basic factual showing that the sisal twine was freely sold in usual wholesale quantities of 500,000 pounds or that the sisal twine was sold at different prices for different quantities, the record falls of its own weight.

We adopt and incorporate here by reference the facts found and conclusions of the trial judge below.

The judgment below is affirmed. It will so enter.

RICHARDSON and ROSENSTEIN, J.J., concur.