**DUSHOFF DISTRIBUTING CORP.**

**v.**

**UNITED STATES.**

R.D. 11702; Reappraisement R64/8521.

United States Customs Court.

May 15, 1970.

Tompkins & Tompkins, New York City (Allerton deC. Tompkins, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Robert Richardson, Department of Justice, Customs Section, and John A. Winters, Woonsocket, R. I., trial attys.), for defendant.

MALETZ, Judge.

This is an appeal for reappraisement which presents the question as to the proper dutiable value of various types of ceramic wall tiles and trimmers that were exported from Japan in July 1963 by the manufacturer, Kamiyama Ceramic Works of Tajimi, Japan, and imported at Philadelphia, Pennsylvania, by plaintiff.[1] The articles were entered at the invoice prices, f. o. b. Nagoya. The government appraisement was made, however, at higher prices. There is no dispute that the proper basis of appraisement of the articles in question is export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)).[2] What gives rise to the dispute is plaintiff's claim that the invoice prices as entered—and not the appraised prices—properly reflect export value.

Section 402 of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a), reads in part, as follows:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade; for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, \* \* \*

\* \* \* \* \* \*

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\* \* \* \* \* \*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices *for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.*

Under these statutory provisions, the first requirement in the definition of export value is that it shall be the price at which such or similar merchandise is freely sold to *all* purchasers at wholesale in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States.[3] This

1. The facts are set forth in the opinion.

2. The imported merchandise is not on the final list, T.D. 54521.

3. The phrase "such or similar merchandise" is defined in section 402(f) (4) (A) (19 U.S.C. § 1401a(f) (4) (A)) as meaning *in the first instance:* "The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same

is to say that export value must (among other things) reflect a price at which *all* purchasers buying in the same quantity may obtain the goods; it can not depend upon prices arrived at by negotiations or bargaining. E. g., F. B. Vandegrift & Co., Inc. v. United States, 60 Cust.Ct. 965, 966, A.R.D. 239 (1968), and cases cited, aff'd 56 CCPA 105, C.A.D. 962 (1969).

It is against this background that we now turn to the record to determine whether the prices at which the imported merchandise was sold were available to any purchaser buying in like quantities, as plaintiff insists, or whether they were individually bargained and preferential prices, as defendant maintains. On this aspect the record consists of (i) an affidavit, dated March 25, 1968, of Sahei Kozakai, the sales manager of the Japanese manufacturer, Kamiyama—which was offered in evidence by the plaintiff, and (ii) a customs agent's report, dated September 25, 1963—which was offered by the government.[4] Considering the affidavit first, it states that all overseas sales by Kamiyama are made at f. o. b. Nagoya; that the company is not related in any way to plaintiff; that "[t]he same prices at which * * * [Kamiyama] sells tiles to * * * [plaintiff] are quoted to and are available to every reputable U. S. buyer buying in the same quantities"; and that Kamiyama imposes no restrictions of any kind on its sales to plaintiff. [Emphasis added.]

Continuing, the affidavit recites that Kamiyama has had a system of varying selling prices "based primarily on the historical pattern of the purchaser as a large quantity buyer (or as a small quantity buyer) of tiles"; that the large quantity buyers are those "who place large quantity orders averaging over * * * $10,000.00 per month"; and that "[t]he concerns buying more

* * * [are] given a preferred price treatment." [Emphasis added.]

The affidavit further recites that in Kamiyama's market, tiles are sold under a procedure whereby buyers place orders in advance; that this is done by means of a continuing series of replenishment orders for the buyer's inventory purposes and on his anticipation of his sales in the immediate future; that "[t]he price might vary slightly between the group of large quantity buyers (those averaging over about dollars 10,000.00 monthly), as well as between the group of small quantity buyers, depending usually upon bargaining ability as the following schedules under the heading of 'Monthly Quantity Minimum' * * * [indicate]"; that this is due to the fact that the monthly purchases of each buyer vary greatly; and that the large buyers maintain an overall average of large orders. [Emphasis added.]

The affidavit adds that the purpose of Kamiyama's pricing policy has been to encourage purchases of larger quantities per order and to stimulate more business; that that policy has covered all sales during the period from March 1, 1963 to August 31, 1964; that usually a number of different tiles are contained in each order; and that "as the following schedule[s] indicate, many more tiles are sold to U. S. large quantity buyer[s] at the specified reduced price applicable to such orders."

The affidavit then sets out a number of schedules listing Kamiyama's prices to U. S. importers during the period from March 1, 1963 through August 31, 1963, for various types of wall tiles and trimmers. Typical is the following schedule which is quoted from the affidavit:

6. During the period from March 1, 1963 through August 31, 1963, my company freely offered for sale and sold without restrictions of any kind

person as, the merchandise undergoing appraisement."

4. 28 U.S.C. § 2633 permits the reception in evidence in reappraisement proceed-

ings of affidavits of persons whose attendance can not reasonably be had, and of customs agents' reports.

flat ceramic Crown Standard Grade 4¼″ x 4¼″ Crown wall tiles to all U.S.A. purchasers at the prices specified below per square foot determined in U. S. dollars, packed, F.O.B. Nagoya, Japan. The following figures cover all sales :—

### Standard White

| Price | Quantity Sold Sq. Ft. | Monthly Quantity Minimum | |
|---|---|---|---|
| $0.12 | 160,988 | Over | $10,000.00 |
| $0.128 | 75,000 | " | " |
| $0.14 | 1,800 | " | " |
| $0.144 | 149,892 | Under | $10,000.00 |
| $0.15 | 23,940 | " | " |

### Standard Salt'n Pepper & Goldentone

| Price | Quantity Sold Sq. Ft. | Monthly Quantity Minimum | |
|---|---|---|---|
| Under $0.14 | 68,400 | Over | $10,000.00 |
| $0.14 | 92,844 | " | " |
| *$0.1408 | 66,000 | " | " |
| $0.144 | 44,500 | " | " |
| $0.1584 | 228,660 | " | " |
| $0.165 | 29,580 | Under | $10,000.00 |

### Standard Other Colors

| Price | Quantity Sold Sq. Ft. | Monthly Quantity Minimum | |
|---|---|---|---|
| Under $0.16 | 48,768 | Over | $10,000.00 |
| *$0.165 | 565,800 | " | " |
| $0.17 | 5,400 | " | " |
| $0.18 | 766,772 | " | " |
| $0.185 | 145,488 | Under | $10,000.00 |
| $0.20 | 190,440 | " | " |

As we have seen, in addition to Kozakai's affidavit of March 25, 1968, the record contains a customs agent's report dated September 25, 1963—which report consists of a summary of an interview the agent had on September 19, 1963, with Kozakai and two other representatives of the Kamiyama company, namely, the acting chief of its export section and its export manager. According to the report, these representatives advised the customs agent that Kamiyama does not grant any individual quantity discounts but rather treats each case individually, and that the length of time Kamiyama has been dealing with a particular importer, as well as quantities ordered, is the determining factor as to prices. For example, they pointed out that Kamiyama had been dealing with a specified importer for about seven years and that that importer, therefore, received "good prices." They indicated that in the case of another importer, Kamiyama had been dealing with him for less than a year and prices to him were, therefore, higher. With respect to sales made to another specified importer, it was explained that Kamiyama had just started dealing with him and that the quantities purchased were small so that prices were higher. When it was pointed out by the customs agent that a particular importer seemed to be enjoying low prices, he was informed that Kamiyama also had been dealing with him for a "long time."

---

* The asterisk identifies the importations here involved and their entered values which are claimed by plaintiff to be the correct dutiable values.

The foregoing portions of the record make it evident that the imported merchandise was *not* freely sold or offered for sale to *all* purchasers at prices dependent upon the quantity they bought. Rather, the conclusion is inescapable that Kamiyama's prices to plaintiff and other importers were specially negotiated and agreed upon, with the particular price determined not according to the quantity of a wholesale order, but by the length of time an importer had been dealing with Kamiyama and his volume of purchases in the past. This is made clear both by the customs agent's report and by Kozakai's affidavit which (as previously indicated) notes (i) that Kamiyama's system of selling prices was "based primarily on the historical pattern of the purchaser as a large quantity buyer"; and (ii) that "[t]he price might vary slightly between the group of large quantity buyers * * * as well as between the group of small quantity buyers, *depending usually upon bargaining ability* * * *." [Emphasis added.]

This conclusion that the imported merchandise was not freely sold to all purchasers at prices dependent upon the quantity they bought is confirmed by the schedules contained in Kozakai's affidavit which set out the prices at which various volumes of wall tiles and trimmers were sold. These schedules fail on their face to disclose any cause-and-effect relationship between the sales prices and the quantities involved, or any correlation between larger quantities and lower prices. Indeed, as the schedules show, in a number of instances the larger quantities commanded not lower but higher prices.

██ In addition to these considerations, plaintiff's case is subject to a further infirmity. In ascertaining the "usual wholesale quantities," the price for which merchandise is sold in equivalent *individual* quantities must be shown, which when combined form the greatest aggregate volume. F. B. Vandegrift & Co., Inc. v. United States, *supra*, 60 Cust. Ct. at 968; Independent Cordage Co., Inc. v. United States, 59 Cust.Ct. 718,

R.D. 11380 (1967), aff'd 63 Cust.Ct. 669, A.R.D. 259, 302 F.Supp. 1335 (1969). As this court pointed out in *Independent Cordage* (59 Cust.Ct. 723–24):

In ascertaining the usual wholesale quantity, consideration must, as the plaintiff contends, be given to an elapsed time period. However, an examination covering such a period of time must focus on that price for which merchandise is sold in equivalent *individual* quantities, which when combined form the greatest aggregate volume, and not, as the plaintiff maintains, on the total volume of goods without regard to the quantities in which individual sales were made. It must be the price for one quantity in an aggregate volume "which is greater than the aggregate volume sold at the price or prices for any other quantity." * * * If volume alone were considered to be the controlling factor, "*usual* wholesale quantities" [emphasis added] is a misnomer, and the statute need merely have recited that the price for the greatest quantity sold within a reasonable period represents the value of the merchandise under consideration.

In the present case, plaintiff is attempting to establish "wholesale quantities" by totaling on an after-the-fact basis the quantities involved at various prices. But thus showing the total volume of merchandise sold without regard to the quantities in which *individual sales* were made is manifestly insufficient. In other words, there is a total absence of proof of the *individual* wholesale quantities in which the merchandise was sold from which a determination of the usual wholesale quantities can be made.

██ In sum, it is concluded that plaintiff has failed to prove that the invoice prices of the imported merchandise, rather than the appraised prices, properly reflect export value within the meaning of the statute. Its appeal for reappraisement is therefore overruled, and judgment will be entered accordingly.