**ALLEN FORWARDING COMPANY**

v.

**UNITED STATES.**

**R.D. 11717; Reappraisement R67/14237.**

United States Customs Court.

July 9, 1970.

Wolf, Block, Shorr & Solis-Cohen, Philadelphia, Pa., (Burton Caine and Ju-dah I. Labovitz, Philadelphia, Pa., of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen., (Herbert P. Larsen and Andrew P. Vance, New York City, co-counsel, trial attys.), for defendant.

WATSON, Judge:

This appeal for reappraisement places in issue the appraised value of certain armorplate glass exported from England in July 1966 and imported into the United States on August 3, 1966 by Allen Forwarding Company for the account of H. Perilstein. The merchandise in question was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at a value of $1.89 per square foot less 2 percent packed, less cost of ocean freight and marine and war insurance. Plaintiff does not dispute the basis of valuation but claims, alternatively, that the appraised value of the merchandise should be $1.61 per square foot or $1.66 per square foot or $1.79 per square foot, all said figures less the above undisputed deductions.

The relevant statutory provisions are as follows:

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) *Export value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(f) *Definitions.*—For the purposes of this section—

* * * * * *

(5) the term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

■ The United States sales manager of the manufacturer's Canadian subsidiary was the sole witness in this case. His testimony established that during the period in question the manufacturer sold merchandise such as that in issue to two purchasers in the United States, H. Perilstein and Cast Optics Corp. The price paid by these purchasers was determined at the beginning of the year based on assurances they made as to the total purchases they expected to make during that year. The price remained in effect regardless of whether or not they did reach that total. The price to Perilstein, based on assurances of purchases of more than 50,000 square feet was $1.61 per square foot, representing a 10 percent quantity discount from the manufacturer's so-called "base" price of $1.79 per square foot. The price to Cast Optics, based on assurances of purchases totaling between 25,000 and 50,000 square feet, was $1.66 per square foot representing a 7.5 percent quantity discount from the so-called "base" price.

Plaintiff claims that the $1.61 per square foot price to H. Perilstein meets the definition of export value as set forth above. In sum, plaintiff claims that this price ($1.61 per square foot) is the price at which such or similar merchandise is freely sold or offered for sale (to all those who will make the same assurances as H. Perilstein) in the principal market in the country of exportation (St. Helens, England) in the usual wholesale quantities (in excess of 50,000 square feet) and in the ordinary course of trade for exportation to the United States, etc.

Stated this way, our attention focuses on the principal source of confusion in this case and the fundamental error in plaintiff's first two claims of $1.61 and $1.66, namely, the matter of "usual wholesale quantity". Plaintiff fixes on the aggregate quantity of 50,000 square feet as if it were the usual wholesale quantity herein. It is not. The usual wholesale quantity is a unit concept applied to individual sales and is simply that quantity in which wholesale sales are usually made. When, in the course of business transactions, there are sales at different prices for different quantities, then, and only then, do we look to see at which price the greatest aggregate quantities were sold. Such is not the case herein. There is no indication that the difference between the price to Perilstein and the price to Optics was related to different quantities or units of quantities purchased in individual sales. Since the quantities involved in individual sales did not differ, there is no reason to look to the aggregate sales to distinguish between them. Neither price can be the price of the sales made in the usual wholesale quantities since there are apparently different prices for the same quantities.

At the risk of belaboring this point, I would like to continue with an example. If the price to Perilstein was $1.61 per square foot for purchases in units of 100 square feet and the price to Optics was $1.60 per square foot in units of 10 square feet, plaintiff's resort to aggregate totals might be valid. What is missing herein is that quantity represented in the hypothetical by 100 square feet or 10 square feet. Presumably the sales made by the manufacturer to its United States purchasers were all sales per square feet, nothing more or less. Consequently, there is no way to fix on

one price and say that it was the one at which sales in the usual wholesale quantities were made. The same quantities in individual sales were evidently sold at different prices.

I find support for this view in the following excerpt from the opinion of the Court of Customs and Patent Appeals in F. B. Vandegrift & Co., Inc. v. United States, 56 CCPA 105, C.A.D. 962 (1969).

> Moreover, even if, *arguendo*, we accepted appellant's argument that the usual wholesale quantity was 50 rolls, there is nothing in the record * * * that even hints that orders of 50 rolls would have been freely sold in 1960–1962 to other distributors at the same price per lineal yard which was extended to Dodge. Indeed, it appears very clear from the testimony of Mr. Dodge that the reason for the low price to Dodge Cork was not the size of each individual order as being at least 50 rolls, but the cumulative annual volume Dodge took. Thus, another distributor not having the accumulated volume of purchases of Dodge, could not presumably have obtained the same price per lineal yard even if he were to have placed an individual order for a minimum of 50 rolls.

In this case, we do not even have the equivalent of the "50 rolls" discussed above by the court of appeals. We have only an entirely different sum, an aggregate volume which does not correspond in any way to usual wholesale quantities.

Plaintiff has not shown that the price which it charges its United States purchasers was different for different quantities in the individual sales, and hence, has given no reason to resort to the statutory language defining usual wholesale quantities in section 402(f) (5), *supra*.

My analysis of this point is essentially the same as that contained in Independent Cordage Co., Inc. v. United States, 63 Cust.Ct. 669, A.R.D. 259, 302 F. Supp. 1335 (1969), in which the court stated as follows:

> * * * What appellant has done is inject into the facts an issue of "usual wholesale quantities" on the legal premise that the total cumulative quantity of the individual quantities sold and purchased in a calendar year, is just as much a usual wholesale quantity as are the individual quantities * * *.

The trial judge rejected appellant's legal premise and held that, as a matter of law, *it is the individual wholesale quantities in which merchandise is freely sold to all purchasers in the ordinary course of trade that determines "usual wholesale quantities", not the cumulative quantity purchased by some over an elapsed period.* We read the law the same way. So read, we also find that, as a matter of fact, the sisal twine was not sold at different prices for different quantities, which is the factual reason for section 402(f) (5), supra, and affirm the decision below.

[Emphasis supplied.]

See also Dushoff Distributing Corp. v. United States, 64 Cust.Ct., R.D. 11702 (1970), for a cogent explanation of this line of reasoning.

Plaintiff's third claim is that the imported merchandise should be appraised at a value of $1.79 per square foot, said price being one which was freely offered to all purchasers regardless of quantity. I am of the opinion that the testimony herein is sufficient to establish a *prima facie* case that this was the export value of said merchandise. The uncontroverted testimony of the witness is sufficient herein and price lists and other documentary evidence demanded by the defendant are not necessary in this instance. United States v. Edison Keith & Co., 5 Ct.Cust. Appls. 82, T.D. 34128 (1914); Park Ave. Imports v. United States, 62 Cust. Ct. 1035, A.R.D. 255 (1969).

In light of the above, I make the following findings of facts.

1. That the merchandise involved herein consists of certain ⅜-inch armorplate glass which was exported from England in July 1966.

2. That the merchandise herein is not on the final list of the Secretary of the Treasury, T.D. 54521.

3. That the merchandise herein was appraised at a value of $1.89 per square foot less 2 percent packed, less the cost of ocean freight and marine and war insurance.

4. That both parties herein agree that the proper basis of appraisement is export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

5. That at the time of exportation said merchandise was available for export to the United States to all purchasers in the usual wholesale quantities and in the ordinary course of trade at a price of $1.79 per square foot.

I therefore conclude as matters of law:

1. That export value as defined in section 402(b) of the Tariff Act of 1930, as amended, is the proper basis of appraisement of the merchandise herein.

2. That plaintiff has established a *prima facie* case that such merchandise was freely sold or offered for sale to all purchasers at wholesale in the usual wholesale quantities and in the ordinary course of trade at the price of $1.79 per square foot.

3. That the expert value of the merchandise herein is $1.79 per square foot less 2 percent packed, less the cost of ocean freight and marine and war insurance.

Judgment will be entered accordingly.