(A.R.D. 309)

JOSEPH A. PAREDES & CO., a/c ANDREW D. DARVAS CO. *v.* UNITED STATES

Entry Nos. 26060; 47518.

## Third Division, Appellate Term

(Decided December 18, 1972)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the appellant.
*Harlington Wood, Jr.*, Assistant Attorney General (*Susan C. Cassell*, trial attorney), for the appellee.

Before RICHARDSON, LANDIS and MALETZ, Judges

MALETZ, Judge : This is an application for review of the decision of the trial court in *Joseph A. Paredes & Co., et al.* v. *United States*, 66 Cust. Ct. 587, R.D. 11746 (1971), affirming the appraised values in two consolidated cases involving plaster-of-paris statuettes and bas reliefs that were imported from England in 1964 and 1966.[1] The plaster-of-paris articles were appraised on the basis of export value under section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. There is no dispute that export value is the proper basis of appraisement; instead, the controversy concerns the correct unit values.

In this latter connection, it is to be noted that the importations were appraised at the invoice unit prices, plus 25 percent, less 2½ percent cash discount, plus packing—which prices according to the government, were based on the manufacturer's "retail price list".[2] Appellant, on the other hand, insists that the correct export values are the invoice unit prices, less 2½ percent cash discount, plus packing. According to appellant, these invoice prices represent the prices contained in the manufacturer's retail price list, less a discount of 20 percent, less a 2½ percent cash discount, plus packing, and fairly reflect market value.

In this setting, the issue is whether the trial court erred in holding that appellant had failed to establish that the invoice prices at which

---

[1] The present case is a retrial of *Joseph A. Paredes & Co., et al.* v. *United States*, 63 Cust. Ct. 557, R.D. 11675 (1969), and the record in that case has been incorporated here.
[2] The prices set forth in the manufacturer's "retail price list" are the suggested prices at which wholesalers purchasing merchandise from the manufacturer should resell such merchandise to British retailers.

the merchandise was sold to the importer—a selected purchaser at wholesale—fairly reflected the market value of the merchandise.[3]

The pertinent statutory provisions covering the export value basis of appraisement as contained in section 402 of the Tariff Act of 1930, as amended, read as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*   \*   \*   \*   \*   \*   \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
    (A) to all purchasers at wholesale, or
    (B) In the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which ex-

---

[3] In the incorporated *Paredes* case—which involved merchandise identical to that in question here—the trial court held similarly that the importer had failed to establish that the sales prices to it as a selected purchaser fairly reflected the market value of the merchandise.

port value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement; (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

(5) The term "usual wholesale quantities," in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

Considering first the record, the following facts appear: Andrew D. Darvas Co. (Darvas), the importer in this case, is a California concern which imports and sells at wholesale various kinds of gift items, including wall decorations, wood carvings, etc.[4] W. H. Bossons, Ltd. (Bossons), the exporter, is a British firm that is engaged in the manufacture of artware, including plaster-of-paris wall masks and wall figures. In or about the latter part of 1962, Bossons and Darvas entered into an understanding under which Bossons agreed to sell Darvas plaster-of-paris articles such as those involved here at Bossons' retail list prices less a wholesale discount of 20 percent.[5] Since September 1965, Bossons has confined its sales of the plaster-of-paris articles in the United States to two wholesale distributors—Darvas and S. P. Skinner & Co. of New York. Under this arrangement, Darvas was given exclusive resale rights in 11 Western States, as well as Texas, Arkansas, Oklahoma and Louisiana, while Skinner was given exclusive

---

[4] Darvas also has a retail gift shop where it sold, among other things, a small amount of the imported plaster-of-paris articles.

[5] At the time of this understanding, Bossons had two other wholesale distributors in the United States to whom it sold at its retail list price less the 20 percent wholesale discount. In addition, up to September 1965, Bossons sold the plaster-of-paris articles directly to a retail department store chain in the United States at its retail list price, less discounts ranging from 7½ percent to 12½ percent; it also made a sale in the United States to another retail department store at a discount of 7½ percent.

rights in the remainder of the United States with the exception of Alaska and Hawaii which were open to both concerns.

According to an affidavit by W. Ray Bossons, the managing director of Bossons, "[s]ales to * * * Skinner * * * have been at a deduction of 20% from the final total of the negotiated sales price" and "[s]ales to * * * Darvas * * * have been based upon a unit discount price of 20%, rounding off the individual figures to make it a more sensible price."

Mr. Bossons' affidavit further states that "[t]he majority of * * * [his] sales in Great Britain are to wholesalers to whom a 25% trade discount is allowed. In a few instances a 27½% trade discount has been granted to this class of buyer. The 25% discount is calculated on each sale and granted where the quantities purchased by the wholesaler are in excess of £12,000 per annum. Wholesalers who buy less than this amount are granted a 20% discount off of the retail home market sales price list." In some instances, the affidavit adds, Bossons sells directly to retail stores in Great Britain at Bossons' retail list prices, less a cash discount of 2½ percent.[6]

Of further interest in Bossons' affidavit is an enclosure consisting of consecutively numbered invoices covering his company's sales in Great Britain and the United States from May 1, 1964 through June 30, 1964, and from September 1, 1966 to October 31, 1966.[7] Examination of these invoices shows that in these periods, of the sales to purchasers in Great Britain, 87 were at 25 percent off list; 6 were at 27½ percent off list; 1 was at 15 percent off; 1 was at 7½ percent off; and 39 were at list *plus* 27½ percent.

The invoice examination further shows that of the sales to the United States in these same periods, 5 were to the importer Darvas and did not show a trade discount; 4 were to the importer Skinner at 20 percent off list; and 1 was to a retail department store at a 7½ percent discount.

To explain why the invoices to Darvas showed no trade discount, Andrew D. Darvas, the owner of the importing company, testified without contradiction at the second trial that at an early point in his company's business relationship with Bossons, various invoices failed to include the 20 percent wholesale discount whereupon Darvas wrote Bossons stating that his company was entitled to it. Bossons agreed and made the necessary invoice corrections. Later, Darvas suggested

---

[6] Added to these sales to retailers is a 25 percent British Purchase Tax which Bossons collects. This 25 percent tax has been held to be a nondutiable item and is not in issue here. See *United States* v. *Alfred Dunhill of London, Inc.*, 32 CCPA 187, C.A.D. 305 (1945) ; *United States* v. *Wm. S. Pitcairn Corp.*, 33 CCPA 183, C.A.D. 334 (1946).

[7] The articles involved in R66/4728 were exported on March 2, 1964, and imported on March 23, 1964, while the articles in R67/7724 were exported on September 9, 1966, and imported on October 1, 1966.

that to avoid future mistakes of this kind, Bossons should set forth on the Customs invoice the *net* price on every item after deducting the 20 percent discount rather than listing separately the retail list price and the 20 percent discount. Bossons followed this suggestion with the consequence that the prices quoted Darvas on the invoices, while on a net basis, actually represented Bossons' retail list price less a 20 percent wholesale discount.

Against this background, appellant contends that the record shows (1) that during the periods in question the major number of sales of the merchandise by the manufacturer, Bossons, in the home market, Great Britain, were made to wholesale distributors at Bossons' retail list price, less a 25 percent discount; (2) that these sales at list less 25 percent thus establish the market value of the merchandise; (3) that during the periods in question Bossons' sales to the importer— a selected purchaser at wholesale—were, as shown by the invoices, made at Bossons' retail list price, less a 20 percent discount; (4) that since the merchandise was thus sold to the importer at invoice prices that were *higher* than the prices at which the merchandise was sold to wholesale distributors in the home market, Great Britain, such invoice prices necessarily represented a fair reflection of market value; and (5) that the trial court was in error in not so holding.

There is, however, a basic difficulty with the essential premise of appellant's argument. The difficulty is that, for the reasons discussed below, appellant has failed to establish that Bossons' home market price of retail list less 25 percent—which price appellant claims is the yardstick demonstrating that the price it paid fairly reflects market value—itself represents market value.

More particularly on this aspect, appellant points out that the record shows that the greatest number of sales in the home market during the periods previously indicated was at a discount of 25 percent off list (the discount which, as noted before, was granted where the quantities purchased by the wholesaler were in excess of £12,000 per annum). "Thus," according to appellant, "it is this price which is * * * the 'usual wholesale quantity' as defined by statute." "[B]eing the price of the usual wholesale quantity," appellant adds, "it may be considered as evidence of the fair market value of merchandise which is offered to a selected purchaser * * *." This argument, though, is bottomed upon an obvious fallacy. For "it is the *individual wholesale quantities* in which merchandise is freely sold to all purchasers in the ordinary course of trade that determines 'usual wholesale quantities', not the *cumulative quantity* purchased by some over an elapsed period." *Independent Cordage Co., Inc.* v. *United States*, 63 Cust. Ct. 669, 673, A.R.D. 259, 302 F. Supp. 1335, 1338 (1969). [Emphasis added.] Put

otherwise, in ascertaining the "usual wholesale quantities", the price for which merchandise is sold in equivalent *individual* unit quantities must be shown, which, when combined, form the greatest aggregate volume. "Usual wholesale quantities" are not derived from the total volume of goods sold over a given period of time to one or more purchasers. *Dushoff Distributing Corp.* v. *United States*, 64 Cust. Ct. 687, 692, R.D. 11702, 312 F. Supp. 1332, 1336 (1970). See also *F. B. Vandergrift & Co., Inc.* v. *United States*, 56 CCPA 105, C.A.D. 962 (1969). As this court stated in *Independent Cordage Co., Inc.* v. *United States*, 59 Cust. Ct. 718, 723–24, R.D. 11380 (1967) : [8]

> In ascertaining the usual wholesale quantity, consideration must, as the plaintiff contends, be given to an elapsed time period. However, an examination covering such a period of time must focus on that price for which merchandise is sold in equivalent *individual* quantities, which when combined form the greatest aggregate volume, and not, as the plaintiff maintains, on the total volume of goods without regard to the quantities in which individual sales were made. It must be the price for one quantity in an aggregate volume "which is greater than the aggregate volume sold at the price or prices for any other quantity." Instead of a "price-for" concept, as required by the statute, plaintiff is attempting to substitute a "price-when" concept, that is, a price dependent on the happening of a certain event, to wit, purchases accumulating in any quantity to a total in excess of 500,000 pounds. If volume alone were considered to be the controlling factor, "*usual* wholesale quantities" [emphasis added] is a misnomer, and the statute need merely have recited that the price for the greatest quantity sold within a reasonable period represents the value of the merchandise under consideration.
>
> As the court views the problem here involved, there is an absence of proof of the *individual* wholesale quantities in which the merchandise was sold from which a determination of the usual wholesale quantities can be made. In order to fulfill the intended meaning of usual wholesale quantities, there must be proof that sales were made at certain equivalent *individual* quantities which when combined formed the greatest aggregate volume. * * *

Quite similar to the present situation was the factual situation in *Allen Forwarding Company* v. *United States*, 65 Cust Ct. 693, R.D. 11717, 314 F. Supp. 769 (1970). In that case, armor plate glass was sold by the manufacturer during the period in issue to two purchasers in the United States, H. Perilstein and Cast Optics Corp. The price paid by these purchasers was determined at the beginning of the year based on assurances as to the total purchases they expected to make during that year. The price to Perilstein, based on assurances of purchases of more than 50,000 square feet of glass, was $1.61 per square

---

[8] Affirmed *Id.* v. *Id., supra,* 63 Cust. Ct. 669.

foot, representing a 10 percent quantity discount from the manufacturer's base price of $1.79 per square foot. The price to Cast Optics, based on assurances of purchases totaling between 25,000 and 50,000 square feet, was $1.66 per square foot, representing a 7½ percent discount from the base price. Plaintiff claimed that the $1.61 per square foot price to Perilstein or alternatively the $1.66 per square foot price to Cast Optics met the definition of export value. Judge Watson rejected these claims on the basis of the following cogent analysis which is equally applicable here (65 Cust. Ct. at 695–96) :

> * * * [O]ur attention focuses on the principal source of confusion in this case and the fundamental error in plaintiff's first two claims of $1.61 and $1.66, namely, the matter of "usual wholesale quantity". Plaintiff fixes on the aggregate quantity of 50,000 square feet as if it were the usual wholesale quantity herein. It is not. The usual wholesale quantity is a unit concept applied to individual sales and is simply that quantity in which wholesale sales are usually made. When, in the course of business transactions, there are sales at different prices for different quantities, then, and only then, do we look to see at which price the greatest aggregate quantities were sold. Such is not the case herein. There is no indication that the difference between the price to Perilstein and the price to Optics was related to different quantities or units of quantities purchased in individual sales. Since the quantities involved in individual sales did not differ, there is no reason to look to the aggregate sales to distinguish between them. Neither price can be the price of the sales made in the usual wholesale quantities since there are apparently different prices for the same quantities.
>
> At the risk of belaboring this point, I would like to continue with an example. If the price to Perilstein was $1.61 per square foot for purchases in units of 100 square feet and the price to Optics was $1.60 per square foot in units of 10 square feet, plaintiff's resort to aggregate totals might be valid. What is missing herein is that quantity represented in the hypothetical by 100 square feet or 10 square feet. Presumably the sales made by the manufacturer to its United States purchasers were all sales per square feet, nothing more or less. Consequently, there is no way to fix on one price and say that it was the one at which sales in the usual wholesale quantities were made. The same quantities in individual sales were evidently sold at different prices.
>
> * * * * * * *
>
> Plaintiff has not shown that the price which it charges its United States purchasers was different for different quantities in the individual sales and, hence, has given no reason to resort to the statutory language defining usual wholesale quantities * * *.

Here, too, there is no way to fix on one home market price and say that it was the one at which sales in the usual wholesale quantities were sold. For the same quantities in individual sales were sold by Bossons

▉▉▉▉▉▉

at different prices to different British wholesalers depending upon the individual wholesaler's aggregate amount of purchases.

In view of the foregoing, we hold that the trial court was correct in affirming the appraised values on the ground that the importer had failed to establish that the invoice prices at which the merchandise was sold fairly reflected market value. Judgment will be entered accordingly.